**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>D.S.C. OF NEWARK ENTERPRISES, INC.,<br>AND FRICTION DIVISION PRODUCTS,<br>INC.,<br><br>    Defendants. | CIVIL ACTION NO. 09-2270 (MLC)<br><br>**MEMORANDUM OPINION** |
| D.S.C. OF NEWARK ENTERPRISES, INC.,<br><br>    Third-Party Plaintiff,<br><br>v.<br><br>CHAMPION INTERNATIONAL<br>CORPORATION (SUCCESSOR TO ST.<br>REGIS PAPER COMPANY), MORTON<br>INTERNATIONAL, INC. (SUCCESSOR TO<br>THIOKOL CHEMICAL COMPANY), DOW<br>CHEMICAL COMPANY, DYNAMIC<br>AUTOMOTIVE DISTRIBUTORS, INC.,<br>MONTROSE MANUFACTURING<br>COMPANY, AND WILLIAM CARNEY,<br><br>    Third-Party Defendants. | |

**COOPER, District Judge**

Plaintiff, United States of America ("Government"), brought
this action against defendants, D.S.C. of Newark Enterprises, Inc.
("D.S.C.") and Friction Division Products, Inc. ("Friction"),
alleging violations of the Comprehensive Environmental Response,

Compensation and Liability Act ("CERCLA"). (See dkt. entry no. 1, Compl.)[1]  D.S.C. filed a third-party complaint against third-party defendants, seeking contribution and cost recovery under CERCLA and contribution and indemnification under New Jersey state law. (See dkt. entry no. 4, Answer & Third Party Compl. at 20, 27.)[2]

The Government moved for summary judgment in its favor on all claims against D.S.C. (See dkt. entry no. 39, Mot. for Summ. J.) The motion was denied without prejudice. (See dkt. entry no. 46, 10-13-11 Order.)  The Government moved for reconsideration of the

---

[1] The Government sought cost recovery, jointly and severally, from D.S.C. and Friction. (See id. at ¶ 1.)  Friction petitioned for Chapter 7 bankruptcy relief in the Eastern District of Pennsylvania on May 19, 2010. (See dkt. entry no. 32-1, Suggestion of Bankruptcy, Ex. A, Notice of Bankruptcy Case Filing.)

[2] D.S.C. named the following third-party defendants: Champion International Corporation (successor to St. Regis Paper Company), Morton International, Inc. (successor to Thiokol Chemical Company), Dow Chemical Company, Dynamic Automotive Distributors, Inc., Montrose Manufacturing Company, and William Carney. (See Answer & Third Party Compl.)  Dynamic Automotive Distributors, Inc., was voluntarily dismissed with prejudice on April 16, 2010. (See dkt. entry no. 30, Stipulation of Dismissal.)  Montrose Manufacturing Company did not respond to the Third Party Complaint, and William Carney submitted an answer, but did not participate in the proceedings any further. (See dkt. entry no. 28, William Carney Ans.)  The following parties responded as successors in interest (collectively, "Third Party Defendants"): International Paper Company ("International Paper") responded as the successor in interest to Champion International Corporation ("Champion") and St. Regis Paper Company ("St. Regis"); Morton International, LLC is the successor in interest to Morton International, Inc., Thiokol Chemical Company ("Thiokol"), and The Dow Chemical Co. ("Dow") (Thiokol, Dow, and Morton referred to collectively as "Morton"). (See dkt. entry no. 50-6, Morton Statement of Material Facts Not in Dispute at 2 ("Morton Statement").)

motion for summary judgment.  (See dkt. entry no. 52, Mot. for
Reconsideration.)  The Third Party Defendants also moved for
summary judgment in their favor on all claims.  (See dkt. entry no.
50, Mot. for Summ. J.)  The Court heard oral argument on both the
motion for reconsideration and the motion for summary judgment by
Third Party Defendants on September 19, 2012.  (See dkt. entry no.
66, Minute Entry for 9-19-12 Hearing.)  The Court ordered the
Government and D.S.C. to submit supplemental briefing.  (See id.)
D.S.C. stipulated to dismissal of International Paper without
prejudice.  (See dkt. entry no. 68, 10-2-12 Order.)  On April 16,
2013, the Government filed a notice of settlement with D.S.C.,
requesting no action from the Court during the time for public
comment on the proposed consent decree.  (See dkt. entry no. 78,
Notice of Lodging of Consent Decree at 1.)  Accordingly, the Court
will now only resolve the motion for summary judgment as it relates
to Morton.

The Court, having heard oral argument on this matter and
reviewed the papers submitted by the parties, will grant summary
judgment in favor of Morton on all claims.

## STANDARD OF REVIEW

The standard for a motion for summary judgment is well-settled
and will be briefly summarized here.  Federal Rule of Civil
Procedure ("Rule") 56(a) provides that summary judgment is proper

if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor." United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009); see Montville Twp. v. Woodmont Builders LLC, 436 Fed.Appx. 87, 89-90 (3d Cir. 2011).

## BACKGROUND[3]

This case concerns response costs incurred by the United States Environmental Protection Agency ("EPA") during the cleanup of a three-acre industrial site (the "Site"), located at 40 Enterprise Avenue in Trenton, New Jersey. (See Morton Statement at ¶ 1.)

## I. Use of the Site Prior to Abandonment

The property was owned by St. Regis from 1938 through the end of 1961. (See id. at ¶ 41.) St. Regis maintained its Panelyte Division at the Site; this operation "manufactured industrial laminates in sheet, tub and rod form for the electrical, appliance,

---

[3] These facts are drawn from the statements submitted by the parties with their papers. Unless otherwise noted, the facts presented are undisputed. See L.Civ.R. 56.1(a) ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion"); Smith v. Addy, 343 Fed.Appx. 806, 808 (3d Cir. 2009). We thus, after ensuring that the parties' respective statements of fact accurately summarize the evidence of record, provide citation to those statements.

machinery and other industries." (Id.) This manufacturing process

employed base materials including "special grades of paper, cotton,

linen or nylon fabric, glass fiber, and asbestos fabric"; the

majority of hazardous substances used by St. Regis in connection

with this operation were stored in tanks on the Site. (Id. at ¶

42.) St. Regis did not build or use any baghouses on the Site.

(See id. at ¶ 45.)[4]

On December 31, 1961, St. Regis sold the Site and its Trenton,

New Jersey Panelyte Division to Thiokol. (See id. at ¶ 46.) St.

Regis included in this transaction some business assets, including:

"all inventories of raw materials, work-in-process, and finished

goods; supplies; and equipment relating to the Panelyte Division's

[at the Site]. St. Regis's inventories were useful products and

valued as part of the sales transaction with Thiokol." (Id. at ¶

47.) The agreement transferring the Site explicitly mentioned that

"[t]he inventory of the [Site], of raw materials, supplies, work in

process and finished goods, is and at the time of the Closing will

continue to be, in good condition and usable and/or saleable in

connection with the business carried on by the Trenton Plant".

---

[4] Baghouses are "large metal air filtering devices . . . that
contain fabric filters through which flows air contaminated with
particulate matter. The filters trap and hold the particulate
matter. When operated properly the particulate matter is
periodically emptied from the baghouses into drums and then shipped
for disposal." (See dkt. entry no. 50-2, Cert. of Lee Henig-Elona,
Ex. J., Decl. of Paul L. Kahn at 5-6.)

(See id. at ¶ 48.)  St. Regis's physical inventory was valued at
$1,554,787 at the time of the sale to Thiokol.  (See id. at ¶ 49.)
The parties intended Thiokol to use St. Regis's product inventory
as part of the newly acquired Panelyte business, maintaining the
current business and operations of St. Regis's Panelyte plant.
(See id. at ¶ 50.)  After the sale to Thiokol, St. Regis ceased any
operations on the Site.  (See id. at ¶ 52.)

Thiokol operated its Panelyte Division on the Site from
January 1962 until 1974.  (See id. at ¶ 53.)  Building 8, located
on the Site, was constructed at some time between 1966 and 1969, at
least four years after St. Regis sold the Site to Thiokol.  (See
id. at ¶ 43.)  Building 8 was constructed on part of the Site that
was previously used as a parking lot.  (See id. at ¶ 44.)
Thiokol's Panelyte Division engaged in a similar process to that of
St. Regis's Panelyte production, "combining asbestos, glass,
cotton, paper or nylon with a synthetic thermosetting resin, and
then curing the mixture under high temperature and pressure to
create a solid homogenous mass."  (Id.)  These operations ended in
1969, when Thiokol stopped manufacturing Panelyte and instead began
manufacturing asbestos brake linings, shoes and pads on the Site as
part of its Friction Division.  (See id. at ¶ 54.)  These products
"were composed of a mixture of asbestos, phenolic resins, and
friction modifying ingredients that were cured under high pressure

and temperature, post-baked, and then machined to dimensional tolerances." (Id.) Between 1970 and 1982, Thiokol purchased and employed "approximately seven Kleissler bag house-type dust separators for use in its operations" on the Site, as well as a "DCE Vokes Unimaster bag house-type dust separator in approximately 1978 for use in the production of drum brake lining". (Id. at ¶ 55.)[5]

Thiokol sold the Site to "KAD Realty (n/k/a DSC, who remains the current owner)" in 1974; from 1974 to 1983, D.S.C. leased the Site back to Thiokol, which continued its Friction Division on the Site. (Id. at ¶ 56.) On July 29, 1983, Thiokol sold its Friction Division to Friction as an independent ongoing business. (See id. at ¶ 57.) The sale included Friction Division's manufacturing equipment, baghouses, works-in-process, raw material inventories,

_____

[5] D.S.C. agrees with the facts provided in this statement, but notes that "Morton installed a total of nine baghouses on the [Site], all of which were cleaned, dismantled and required asbestos removal by the Plaintiff." (Dkt. entry no. 56-3, D.S.C. Responsive Statement of Material Facts at ¶ 55 ("D.S.C. Statement").) D.S.C. cites, as support from the record, "Third-Party Defendants' Statement of Material Facts Not in Dispute at ¶31." (Id.) The cited paragraph reads "In total, EPA removed approximately 70 tons of asbestos waste from the nine bag houses and removed more than 700 containers of waste chemicals for proper off-site disposal." (Morton Statement at ¶ 31 (citation omitted).) There is no mention of Thiokol purchasing nine baghouses contained in this statement. This does not satisfy Local Civil Rule 56.1, which requires that the opponent to the motion support each asserted factual dispute with facts found in documents from the record. See L.Civ.R. 56.1. The Court will accordingly treat the facts as presented in the above text as undisputed.

and supplies.  (See id. at ¶ 58.)  The parties to the sale

characterized Thiokol's inventories as useful products and valued

the products as part of the business assets that were sold as a

going concern to Friction for over $2 million.  (See id.)  "[T]he

building was in good physical condition during Thiokol's tenancy."

(Id. at ¶ 59.)

Friction began its brake manufacturing operations on the Site,

including use of the baghouses and other equipment purchased.  (See

id.)  Friction leased the Site from D.S.C. and manufactured brake

shoes and pads on the Site from 1983 until approximately 2002.

(See id. at ¶ 16.)[6]  Friction used, inter alia, "asbestos, motor

oil, methy ethyl ketone, iron powders, adhesives, anti-freeze,

_____

[6] D.S.C. argues that the facts alleged by Third Party
Defendants in paragraphs 16, 17, 18, 19, and 39 "are not supported
by admissible evidence pursuant to FRCP 56(c)(2).  D.S.C. does not
adopt Friction's Answers to Requests for Admissions."  (See, e.g.,
D.S.C. Statement at ¶ 16.)  Rule 56(c)(2) provides: "A party may
object that the material cited to support or dispute a fact cannot
be presented in a form that would be admissible in evidence."
Fed.R.Civ.P. 56(c)(2).  This Rule merely enables a party to object
if materials cited in support of a summary judgment motion are not
in an admissible form.  Rule 56(c)(2) does not itself provide a
basis for excluding materials cited or facts drawn from those
materials.  Rule 56(c)(1)(A) provides: "A party asserting that a
fact cannot be or is genuinely disputed must support the assertion
by citing to particular parts of materials in the record, including
depositions, documents, electronically stored information,
affidavits or declarations, stipulations (including those made for
purposes of the motion only), admissions, interrogatory answers, or
other materials".  Fed.R.Civ.P. 56(c)(1)(A).  D.S.C. has neither
made a proper objection to the admissibility of the form of these
materials nor created genuine factual disputes, and thus the Court
will deem these facts to be undisputed.

ethylene glycol and manganous oxide . . . [as well as storing] paint[,] paint stripping agents, [and] waste oil" on the Site during the same period.  (Id. at ¶ 17.)  Friction's operational processes created asbestos dust, which was collected and stored in the baghouses located on the Site; Friction contained other wastes and hazardous substances in barrels, containers, and other types of closed receptacles as well.  (See id. at ¶ 18.)  In 2002, Friction "ceased operations at the [Site], abandoning barrels and other containers of hazardous substances and waste materials in the form of both production materials and production waste."  (Id. at ¶ 19.) The Site was in "disarray" at the time Friction abandoned it; "[w]alls and utility lines were left damaged, the electrical system was dismantled, drums of unknown materials were strewn about, and piles of unknown debris, chemicals and unknown materials were abandoned throughout the leasehold."  (Id. at ¶ 20.)

## II.  EPA's Investigation and Surface Cleanup of the Site

The Bureau of Emergency Response, Region II (the "Bureau") was notified of an abandoned facility (the Site) on December 8, 2005. (See id. at ¶ 21.)  The abandoned facility was known as "Friction Division Products, Inc., and consisted of two buildings (Buildings 7 & 8) and nine free standing bag houses".  (Id.)  The Bureau inspected the Site on December 14, 2005, finding leaking drums of hazardous materials and broken bags of hazardous powders.  (See id.

at ¶ 22.)  The Bureau discovered "five-gallon pails of unknown
materials and drums of motor oils, methyl ethyl ketones, iron
powders, antifreeze, and brake bonding adhesives" abandoned in
Building 7.  (Id.)  Some of the drums containing adhesives had
leaked and left solidified material on the floor.  (See id.)  The
Bureau found open bags of sulfur compounds and fiber drums of
sodium hydroxide with crystallization on the outside.  (See id.)
Building 7 had no electrical power and its roof was leaking; the
Bureau found over 100 abandoned drums in Building 7.  (See id.)

Building 8 had two rooms; the first room held "highly
incompatible chemicals including containers of aluminum powders in
an epoxy phenol base, phenolic resins in fiber drums, drums and
containers of bis butyl peroxy di-isopropyl benzene, containers of
iron powders in sulfuric acid, [and] containers of hexamethylene
tetra amine", as well as unlabeled chemicals in drums.  (Id. at ¶
23.)  The second room had rows of "stacked 55 gallon drums, many of
which showed signs of leakage. . . . In sum, Friction left hundreds
of drums of liquid chemicals and tons of solid chemicals in the
buildings."  (Id.)

The Bureau issued D.S.C. a "Field Directive/Notice to
Insurer(s) finding 'that there is an illegal storage of hazardous
waste drums and containers.  Numerous drums have evidence of
leakage.  The property where the drums are stored is classified as

10

abandoned.'" (Id. at ¶ 24.) The EPA and New Jersey Department of Environmental Protection conducted joint investigations and inspections of the Site between December 2005 and May 2006, observing numerous releases on the Site. (See id. at ¶ 25.) The releases were caused by chemicals leaking, spilling, or escaping from the abandoned containers as the containers deteriorated; other releases resulted from chemicals being displaced by rainwater, which entered the containers from the leaking roof, causing the chemicals to overflow the containers. (See id. at ¶ 26.)

The EPA originally agreed that Friction and D.S.C. would work to clean the Site, but subsequent EPA reports show that Friction only removed a few drums from the buildings, instead shipping useable material (i.e., brake shoes) to its facility in Virginia. (See id. at ¶ 27.) The initial agreement resulted in "only a small amount of the drums and pallets of bagged chemicals [being] actually removed, with the remainder simply being restaged to different locations within the [Site]." (Id.) "On June, 15, 2006, additional releases were observed when Friction spilled chemicals on the floor of one of the storage buildings while attempting to remove chemicals it had previously abandoned at the [Site]." (Id. at ¶ 28.)

The EPA undertook a removal action under § 104 of CERCLA in January 2007, after D.S.C. and Friction failed to take any

corrective action.  (See id. at ¶ 29.)  The EPA sought to remove

"[t]he hazardous substances found . . . at the [Site, including]

asbestos, ethylene glycol, manganese oxide, Resource Conservation

Recovery Act ("RCRA") ignitable wastes, and RCRA corrosives, all

qualifying as CERCLA hazardous substances."  (Id.)  The EPA engaged

in removal activities including: "decontaminating work areas;

locating and restaging drums and containers;" disconnecting and

cleaning asbestos-filled baghouses; bulking abandoned brake pads;

transporting the baghouses to an existing, enclosed building on the

Site; removing asbestos waste under negative pressure;

containerizing the asbestos waste material; and shipping asbestos

waste for disposal in a RCRA-permitted landfill.  (Id. at ¶ 30.)

The EPA conducted testing on 455 samples taken from almost every

container at the Site, which were then used to consolidate waste

streams for off-site disposal.  (See id.)  "In total, EPA removed

approximately 70 tons of asbestos waste from the nine bag houses

and removed more than 700 containers of waste chemicals for proper

off-site disposal."  (Id. at ¶ 31.)  The "EPA incurred response

costs of at least $1,255,125.75 as a result of this Surface

Cleanup."  (Id. at ¶ 37.)

     The EPA completed the surface cleanup on September 21, 2007,

and subsequently began efforts to recover costs from D.S.C. and

Friction.  (See id. at ¶¶ 32-34.)

**ANALYSIS**

The Court will first address the claims under CERCLA, and then those claims arising under New Jersey state law for contribution and indemnification.

## I.    CERCLA Claims for Contribution and Cost Recovery

D.S.C. brings claims against the Third Party Defendants seeking cost recovery under § 107(a) and contribution under § 113(f)(1). (See Answer & Third Party Compl. at 20-25.) Morton argues it is not liable under either section because: (1) the sections require potentially responsible parties to seek contribution or recovered costs only from liable parties, which Third Party Defendants claim they are not; (2) D.S.C. did not pay more than its fair share of cleanup costs incurred by the EPA, precluding it from seeking contribution under § 113(f)(1); and (3) D.S.C. did not incur any cleanup costs of its own and cannot seek cost recovery under § 107(a). (See dkt. entry no. 50-1, Br. of Morton in Supp. of Mot. for Summ. J. at 16 ("Morton Br.").)

D.S.C. responds that there are material facts in genuine dispute precluding summary judgment, and that it "should be given a full opportunity to prove (A) that Morton is a CERCLA-liable party as an owner/operator and/or an arranger, and (B) an equitable allocation . . . regarding the surface cleanup costs". (Dkt. entry no. 56, Def. Br. in Opp'n to Mot. for Summ. J. at 2, 3 ("D.S.C.

Opp'n Br.").)  Morton responds to D.S.C.'s opposition that (1)
D.S.C.'s claim for $23,900 for asbestos removal costs under CERCLA
is time-barred under § 113(g)(2)(A), and (2) Morton is not liable
for contribution under § 113(f) because Morton is neither a former
owner or operator nor an arranger.  (See dkt. entry no. 63, Morton
Reply in Supp. of Mot. at 1-2 ("Morton Reply Br.").)

D.S.C. conceded at oral argument that the out-of-pocket costs
of $23,900 from asbestos clean-up in 1997 were time-barred.  (See
dkt. entry no. 77, Tr. of 9-19-12 Hearing, at 69 ("9-19-12 Tr.").)[7]
Therefore, the Court will, without further discussion, grant
summary judgment to Morton on that aspect of D.S.C.'s claim.

The United States Supreme Court has distinguished between
actions to recover incurred cleanup costs under § 107(a) -- which
may be sought by any private party, including a potentially
responsible party, at any time -- and actions for "contribution"
under § 113(f), which may only be undertaken by a party subject to
a judgment or settlement agreement based on §§ 106 or 107(a) that
resulted in an inequitable distribution of common liability.  See
United States v. Atl. Research Corp., 551 U.S. 128, 139 n.6 (2007)
("[C]osts incurred voluntarily are recoverable only by way of §
107(a)(4)(B), and costs of reimbursement to another person pursuant

---

[7] "THE COURT:  . . . Ms. Henig-Elona, what about your Statute
of Limitations problem on your own $23,000 out-of-pocket response
outlay?  MS. HENIG-ELONA: I think we're out of luck on that.  THE
COURT:  Okay.  Morton just got that."  (9-19-12 Tr. at 69.)

14

to a legal judgment or settlement are recoverable only under §
113(f).").

Section 113 of CERCLA provides that any person may seek
contribution from any other person who is liable or potentially
liable under § 107(a) of CERCLA.  See 42 U.S.C. § 9613(f)(1).
Section 113 "does not in itself create any new liabilities; rather,
it confirms the right of a potentially responsible person under
section 107 to obtain contribution from other potentially
responsible persons."  New Castle Cnty. v. Halliburton NUS Corp.,
111 F.3d 1116, 1122 (3d Cir. 1997).  The purpose of § 113 is to
permit a potentially responsible person "to recoup that portion of
its expenditures which exceeds its fair share of the overall
liability."  Id.

In order to establish another potentially responsible person's
liability for contribution under § 113, the potentially responsible
person seeking contribution must prove four elements that establish
liability under § 107, namely that: (1) the property is a
"facility"; (2) a "release" or "threatened release" of a hazardous
substance from the property has occurred; (3) a release or
threatened release has caused the claimant to incur "response
costs"; and (4) the defendant falls within one of the four
categories of "responsible parties".  United States v. CDMG Realty

Co., 96 F.3d 706, 712 (3d Cir. 1996) (citing United States v. Alcan Aluminum Corp., 964 F.2d 252, 258-59 (3d Cir. 1992)).

There is no dispute that the Site constitutes a "facility", or that Friction's abandonment of the Site serves as a "release" or "threatened release", or that the EPA incurred response costs that it has settled with D.S.C.[8]  The Court thus focuses on the last element, namely whether Morton falls within one of the four categories of responsible parties as delineated in § 107.  See 42 U.S.C. § 9607(a) (defining "covered persons" to include a current owner or operator, an owner or operator at the time of disposal, an arranger, or someone who transports substances to the facility).[9]

---

[8] See dkt. entry no. 78, Notice of Settlement, Ex. 1, Proposed Consent Decree at 4 ("'Past Response Costs' shall mean all costs, including but not limited to direct and indirect costs, that EPA or DOJ on behalf of EPA has paid at or in connection with the Site through the Effective Date, plus accrued Interest on all such costs through such date."), 5 ("Payment by Settling Defendant for Past Response Costs.  Within 30 days after the Effective Date, Settling Defendant shall pay to EPA a total of $1,562,500.00").

[9] The text of § 107(a) provides that liability for "[c]overed persons" will extend to:
        (1) the owner and operator of a vessel or a facility,
        (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
        (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

Section 107(a)(1) applies to all current owners and operators, while § 107(a)(2) covers prior owners and operators.   Compare 42 U.S.C. § 9607(a)(1), with § 9607(a)(2).   The scope of § 107(a)(2) is more limited than that of § 107(a)(1); prior owners and operators are liable for a release at a facility only if they owned or operated the facility "at the time of disposal of any hazardous substance".   42 U.S.C. § 9607(a)(2).

CERCLA defines "disposal" by incorporating the definition of the same term, as provided in RCRA.   See 42 U.S.C. § 9601(29) ("The terms 'disposal', 'hazardous waste', and 'treatment' shall have the meaning provided in section 1004 of the Solid Waste Disposal Act.").   RCRA defines the term "disposal" to mean:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3).   A prior owner who owned a waste site at the time of "disposal" is only liable in the event of a "release" or

---

> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance . . . .

42 U.S.C. § 9607(a).

17

"threatened release."  42 U.S.C. § 9607(a)(2).  CERCLA defines

"release" as follows:

> The term "release" means any spilling, leaking, pumping,
> pouring, emitting, emptying, discharging, injecting,
> escaping, leaching, dumping, or disposing into the
> environment (including the abandonment or discarding of
> barrels, containers, and other closed receptacles
> containing any hazardous substance or pollutant or
> contaminant) . . . .

Id. § 9601(22).  Thus, the scope of "release" is broader than that

of "disposal": "release" encompasses "disposing", by explicitly

including named elements of the "disposal" definition, and

"release" also includes some additional terms.

D.S.C. alternatively claims that Morton is liable as an

"arranger" under § 107.  Section 107(a)(3) provides that this class

of parties concerns "any person who by contract, agreement, or

otherwise arranged for disposal or treatment . . . of hazardous

substances . . . at any facility or incineration vessel owned or

operated by another party or entity and containing such hazardous

substances".  42 U.S.C. § 9607(a)(3).  The Court of Appeals for the

Third Circuit has held:

> [T]he most important factors in determining "arranger
> liability" are: (1) ownership or possession; and (2)
> knowledge; or (3) control. Ownership or possession of
> the hazardous substance must be demonstrated, but this
> factor alone will not suffice to establish liability. A
> plaintiff must also demonstrate either control over the
> process that results in a release of hazardous waste or
> knowledge that such a release will occur during the
> process. We note, too, that in conducting this analysis
> a court should not lose sight of the ultimate purpose of

18

[§] 113, which is to determine whether a defendant was
sufficiently responsible for hazardous-waste
contamination so that it can fairly be forced to
contribute to the costs of cleanup.

Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 677-78

(3d Cir. 2003). "In common parlance, the word 'arrange' implies

action directed to a specific purpose"; "arrange" means "to make

preparations for[;] plan[;] . . . to bring about an agreement or

understanding concerning." Burlington N. & Santa Fe Ry. Co. v.

United States, 556 U.S. 599, 611 (2009) (interpreting the intent

prong of CERCLA's "arranger" liability provision). "Consequently,

under the plain language of the statute, an entity may qualify as

an arranger under § 9607(a)(3) when it takes intentional steps to

dispose of a hazardous substance." Id.

   "[K]nowledge alone is insufficient to prove that an entity

'planned for' the disposal . . . ." Id. at 612; United States v.

Gen. Elec. Co., 670 F.3d 377, 383, 390 (1st Cir. 2012) (finding,

under Burlington, "that mere knowledge of future disposal will not

trigger arranger liability," but that a "well-documented history of

purposeful inaction" demonstrated sufficient intent to render

defendant liable for arranging for the disposal of a hazardous

substance); Celanese Corp. v. Martin K. Eby Constr. Co., 620 F.3d

529, 533 (5th Cir. 2010) ("the entity must 'take [ ] intentional

steps' or 'plan[ ] for' the disposal of the hazardous substance")

(citing Burlington, 556 U.S. at 612); Litgo N.J., Inc. v. Bob

Martin, No. 06-2891, 2010 WL 2400388, at *23 (D.N.J. June 10, 2010)

("[I]n order to be a responsible party a defendant must have had

the intent, as opposed to mere knowledge, that at least a portion

of the product be disposed of during the arranged for process.").

The Court will also consider other factors demonstrating

intent to arrange for disposal of hazardous substances:

> In Concrete Sales & Servs., Inc. v. Blue Bird Body Co.,
> the court compiled a comprehensive list of factors that
> courts have considered in discussing "arranger
> liability," including: "(1) whether a sale involved the
> transfer of a 'useful' or 'waste' product; (2) whether
> the party intended to dispose of a substance at the time
> of the transaction; (3) whether the party made the
> 'crucial decision' to place hazardous substances in the
> hands of a particular facility; (4) whether the party
> had knowledge of the disposal; and (5) whether the party
> owned the hazardous substances."

Morton Int'l, 343 F.3d at 678.

The parties separate their arguments regarding Morton's status

as a former owner/operator from those regarding its status as an

arranger.  The Court will do likewise, addressing first whether

Morton is a former owner or operator, and then whether Morton is an

arranger.

### A.    Former Owner or Operator

Morton argues that D.S.C. cannot prevail on the § 113 claim

because Morton is not a potentially responsible party under §

107(a).  (See Morton Br. at 17-18.)  Morton argues that it is not

liable as a former owner or operator because it did not own the

Site "at the time of disposal of any hazardous substance" that was involved in the Surface Cleanup. (See id. at 18.) Morton argues that the relevant time of "disposal" was Friction's abandonment of the hazardous substances, and thus they cannot be liable because the Site had long before passed out of Morton's hands. (See id.)

Morton conflates the "release" that the EPA identifies as Friction's abandonment, with the "disposal" that is relevant for liability against former owners or operators. (See id. at 19 ("As explained by the EPA, the drums and other containers of hazardous substances addressed during the Surface Cleanup were 'released' when Friction abandoned them at the Property in 2001/2002. . . . As such, Third-Party Defendants were not owners or operators of the [Site] at the time of the release giving rise to the Surface Cleanup that resulted in EPA's incurrence of response costs.").) As explained above, "release" is a broader term than "disposal" and it is the time at which "disposal" occurs that is relevant to determining whether a former owner or operator is liable for a subsequent release. See 42 U.S.C. § 9607(a)(2).

Morton further argues that the Government has stated it "has no reason to believe [that] the disposal of hazardous substances occurred while either Morton International or International Paper owned/operated the Site." (Morton Br. at 19.) Morton argues that D.S.C. admitted that Morton's predecessor maintained the Site in

good physical condition before Friction began its operations, and that "[a]ll of the equipment and materials" at the Site were transferred to Friction at the time Friction purchased Morton's predecessor's operating assets located at the Site. (Id.) Morton argues that D.S.C. has discovered no facts that "demonstrate a nexus between [other releases at the Site associated with Morton's predecessors' historic operations] and the response costs incurred by [the] EPA to address the Surface Cleanup." (Id. at 20.) Morton denies that "volumetric and/or temporal theories for apportionment of harm" are relevant to determining liability among the Third Party Defendants because there is "no factual basis" on which to assign liability to the Third Party Defendants for the cleanup of Friction's abandoned hazardous substances. (Id. at 21.) Morton relies on admissions by the Government and both D.S.C. and Friction "that the Surface Cleanup resulted from Friction's operations, poor housekeeping, and ultimate abandonment of the hazardous substances on the [Site] in 2001/2002." (Id.)

D.S.C. disagrees with Morton's position that Morton is not liable because there was no release during its ownership of the site. (See D.S.C. Opp'n Br. at 4.) However, D.S.C. does not coherently provide either law or disputed facts to rebut the law and summary of the record provided by Morton, when D.S.C. argues as follows:

> D.S.C. incurred $23,900 in direct response cost [sic]
> for asbestos removal.  These costs may be attributable
> to either [Friction] or Morton, the only two parties
> that are known to have produced asbestos waste.  Thus,
> in accordance with <u>Atlantic Research</u>, . . . Morton is
> potentially liable under [§ 113 due to its status as a
> potentially responsible party as defined in] § 107(a)(2)
> (as an owner and operator at the time the asbestos waste
> was disposal [sic]).  Even Morton recognized that
> "CERCLA case law holds that a party may be liable as a
> former owner or operator where drums or other containers
> were abandoned <u>during its period of ownership or
> operations</u>", citing <u>New York v. Almy Brothers, Inc.</u>, 866
> F.Supp. 668, 677 (N.D.N.Y. 1994).

(<u>Id.</u>)[10]  D.S.C. argues that Morton has admitted it ground asbestos

brakes and utilized baghouses to capture asbestos dust; thus,

D.S.C. argues, "Morton is liable for any asbestos wastes that were

generated and disposed of at the [Site] at the time of its

ownership and operations. . . . Thus, abandoning asbestos dust in

the baghouses would be considered a disposal."  (<u>Id.</u> at 5.)  While

Morton would be liable had it disposed of asbestos waste, D.S.C.

has not pointed to any facts in the record demonstrating that

Morton engaged in improper disposal of asbestos dust.

Disposal is a specifically defined term for CERCLA purposes,

which requires that the hazardous substance be placed "into or on

any land or water" in such a way that it "may enter the environment

or be emitted into the air or discharged into any waters, including

---

[10] While this argument centers on recovery of D.S.C.'s
incurred $23,900 costs of response, which have been withdrawn as
conceded at oral argument, the analysis of Morton's status as a
potentially responsible party under § 107 is nonetheless relevant
for resolution of whether Morton is liable under § 113.

ground waters." 42 U.S.C. § 6903(3) (RCRA definition, which was adopted for CERCLA definition). D.S.C. does not point to facts showing that Morton, at any time during its ownership or operation of the Site, disposed of asbestos dust in or on the land in such a way that the dust could enter the environment. D.S.C. notes that Morton stored asbestos dust in the baghouses and claims Morton may not have removed all of the dust it put into the baghouses before selling the Site, arguing that this satisfies all elements of "disposal" for CERCLA liability, because the dust could potentially later be released, as it was when Friction abandoned the Site. (See D.S.C. Opp'n Br. at 11-12.) D.S.C. cites as evidence for this claim the Action Memorandum produced by the EPA following that agency's investigation of the Site after Friction abandoned it and Morton's responses admitting it installed and operated the baghouses from 1970 until 1980, but no documents or affidavits showing that there was dust left in the baghouses when Morton transferred the property to Friction. (See id. at 9-12.)

D.S.C. claims that, while Morton admits to filling the baghouses with asbestos dust, Morton does not identify any asbestos waste handlers that "removed, handled or disposed of" the asbestos waste during the period of Morton's operations. (Id. at 11-12.) D.S.C. claims this raises a genuine issue of material fact precluding summary judgment because D.S.C. may, upon further fact-

gathering and witness depositions, discover that "most of the 70+ tons of asbestos that the [EPA] removed in the Surface Cleanup was Morton's abandoned waste."  (Id. at 12.)  During oral argument, D.S.C. referred to the documents that Morton relied upon to show that waste was hauled away, and noted there were discrepancies between the total weight in materials brought onto the property and how much was removed.  (See 9-19-12 Tr. at 28-29 (noting gaps between amounts of zinc powder and asbestos brought onto the Site and the amounts of same that were shipped to landfills).)

Morton disputes D.S.C.'s claim that "abandoning asbestos dust in the baghouses would be considered a disposal" because "Morton is unaware of any case that holds that the mere use of an air pollution control device to collect a hazardous substance to prevent a release constitutes disposal of that substance, particularly where, as here, the substance was subsequently collected and disposed offsite."  (Morton Reply Br. at 7.)  Morton also replies that discovery produced documents demonstrating that Morton contracted third-party waste haulers to collect and dispose of, off-site, any asbestos dust collected in the baghouses during its historic operations on the Site.  (See id. at 6.)

Morton clarified at oral argument that it was not required to specifically utilize asbestos haulers to remove dust during its historic operations because "the regulations requiring a specific

asbestos waste hauler did not come into play until 1984, so that was a year after Morton sold the business to Friction." (9-12-12 Tr. at 10.) Morton also addressed D.S.C.'s attempt to raise genuine disputes of material facts about discrepancies in the documents:

> I'll just address the document that was referenced by DSC as calling into question [whether Morton removed all the asbestos dust from the baghouses]. Again, this document merely shows the inventory of asbestos that came onto the facility. And, again, the asbestos was used in the manufacturing process. There absolutely wouldn't be the same amount of asbestos dust leaving the property [through] the waste contractors as the inventory that was used. And this is also just a snapshot of a year. While some of that inventory may have come in in this year, it doesn't necessarily mean it was all going to be used in this year and, therefore, it could be some leftover from a year before.

(Id. at 64-65.)

D.S.C. does not attribute liability solely on the basis of the dust allegedly left inside the baghouses; D.S.C. also advances a theory that Morton disposed of asbestos dust on the ground outside on the Site. D.S.C. argues that asbestos dust was also in "piles on the ground outside" in 2005 when the EPA "arrived on the scene . . . prior to doing any work in [2007]." (Id. at 38.) The Court questioned how D.S.C. could establish that any asbestos on the floor could be attributed to Morton. (Id.) D.S.C. replied:

> Now I don't know how I'm going to know, or how the Government could possibly know whether that was sitting there for five, six, twelve or twenty years. So, I would think it's going to take a witness, either from

DSC, or Morton, or someone who was at the site to say,
"Yes, it was there when we got there" or, "No, it wasn't
there when we got there," or maybe no one will prove it.
But a fact finder is going to have to determine how long
that pile was sitting there.

(Id.)  D.S.C. stated that it needed to depose witnesses to

determine whether there was asbestos on the ground at the time

Morton transferred the property to Friction.  (See id. at 39.)

Morton denied that depositions were necessary to determine if

any asbestos dust was left in piles on the ground:

[W]e have that evidence already.  DSC, in 2008, answers
EPA's 104(e) request and specifically affirms that from
October, 1974 to December, 1984, Morton-Thiokol was
responsible for such concerns.  They sold the assets of
their Friction Division to Friction Products, and sold
the lease to Friction Division Products.  All of the
equipment and materials of the space during the time
were transferred, and the building was in good physical
condition during their [tenancy].
There is no indication that the baghouses were in a
state of disarray or that there was a threat of release
at that time.  The representative from DSC already spoke
to this issue, that's the best evidence, and the very
evidence that DSC says now they want to go and obtain.
So, to suggest that there may be more discovery that
they can take to show what the condition of the property
was at the time of the sale, it exists already.  DSC
itself admitted [and] Friction Products admitted in
their discovery responses that there [were] no issues
caused by Morton-Thiokol's operations [on] the property.

(Id. at 63-64.)  In D.S.C.'s Responses to the EPA's Request for

Information under 42 U.S.C. § 9604(e), D.S.C. admitted these facts:

The condition of the building(s) was the tenant's
responsibility.  From October 1974 to December 1984
[Morton] was responsible for such concerns.  [Morton]
sold the assets of their "Friction Division" to
[Friction].  [Morton] assigned the lease to [Friction].

> All of the equipment and materials in the space during
> this time were also transferred to [Friction] (as listed
> in the subject leases and [Friction's] May 18, 1987
> transmittal defining equipment owned, see attachments).
> a. The building was in good physical condition during
>    [Morton's] tenancy.
>    . . .
> d. [Friction] left the subject site in disarray.
>    Exterior and interior walls were damaged, utility
>    lines including gas, sewer, water and sprinkler
>    systems were damaged, heating systems including
>    boilers and gas fired heaters were taken, the entire
>    electrical system was dismantled, drums of unknown
>    materials were strewn about, piles of unknown debris,
>    chemicals and other unknown materials were left
>    throughout the leasehold.

(See dkt. entry no. 50-2, Camille V. Otero Certification, Ex. G,

D.S.C. Responses to EPA 104(e) Requests for Information at ¶¶ 14,

(a), (d).)  The admission distinguishes between the "good physical

condition" in which Morton left the Site and the "disarray"

Friction caused, including "piles of unknown debris, chemicals and

other unknown materials [] left throughout the leasehold."  (Id.)

This succinctly rebuts D.S.C.'s current request for information.

Accordingly, D.S.C.'s request for additional discovery is

unnecessary in light of the facts Morton has identified in the

record.

The Court finds that, contrary to D.S.C.'s argument that any

use of the baghouses constitutes disposal, containerizing asbestos

dust for temporary storage does not constitute a "disposal" under

CERCLA.  (See D.S.C. Opp'n Br. at 5.)  The term "disposal" requires

that the hazardous substance be placed "into or on any land or

water" in such a way that it may enter the environment. 42 U.S.C. § 6903(3). Where hazardous substances are held within a container for a purpose other than disposal, there is no release unless and until the container is abandoned. See 42 U.S.C. § 9601(22) ("The term 'release' means . . . the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substances."); see also Litgo, 2010 WL 2400388, at *26 (finding the government had engaged in illegal "disposal", rather than permitted "storage", of containerized waste because the underlying intent was to "permanently get rid of what they believed to be waste products" by shipping drums to warehouse).

In the context of hazardous wastes, storage is defined as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C. § 6903(33). The key distinction between storage and disposal hinges on the temporary nature of storage. Compare United States v. Amtreco, Inc., 809 F.Supp. 959, 965-66 (M.D. Ga. 1992) (mere storage when chemical was held on-site pending its use in wood-treatment operations), with United States v. Fleet Factors Corp., 821 F.Supp. 707, 722-23 (S.D. Ga. 1993) (disposal when drums were placed in building for indefinite future). D.S.C. has not demonstrated that Morton intended to "permanently get rid of" the asbestos dust by

29

containing it in the baghouses; the facts instead demonstrate that Morton merely stored it there for regular removal by the waste haulers.  (See Morton Reply Br. at 8.)

There are no genuine disputes of material fact with respect to whether there was a disposal during Morton's operations through asbestos dust left either on the ground or inside the baghouses. Without a disposal during the time Morton owned or operated the Site, Morton cannot be a former owner or operator as defined under § 107.  See 42 U.S.C. § 9607(a)(2) ("any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of") (emphasis added).  Morton has demonstrated that the facts do not support this conclusion and D.S.C. has not demonstrated there is any genuine dispute about those facts.  Thus, Morton cannot be liable for contribution under § 113 as a "former owner or operator" of the Site.

**B.   Arranger Liability**

Without a contract or some agreement between Friction and Morton specifically for the treatment or disposal of the asbestos, the sole issue is whether Morton, by selling its business as a going concern to Friction, "otherwise arranged" for the disposal or treatment of a hazardous substance.  See 42 U.S.C. § 9607(a)(3). Morton argues that the "unambiguous transaction documents

[recording the sales of the Site from St. Regis to Morton and then from Morton to Friction] demonstrate that Third Party Defendants' predecessors did not sell any assets, products or other materials to Friction with the intent to dispose of those materials." (Morton Br. at 24 (citing Burlington, 556 U.S. at 612 ("In order to qualify as an arranger, Shell must have entered into the sale of D-D with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).")).)

D.S.C. argues that the inquiry into whether Morton is potentially liable as an arranger is "fact-intensive[, looking] beyond the parties' characterization of the transaction as a 'disposal' or a 'sale' and [seeking] to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA's strict liability provisions." (D.S.C. Opp'n Br. at 7 (internal citation and quotation omitted).) D.S.C. does not engage in any analysis under this inquiry, nor does it point to facts or demonstrate factual disputes concerning what alleged intentional steps Morton took to "otherwise arrange for" disposal of asbestos waste that would justify holding Morton liable as an arranger. (See id. at 7-8.) D.S.C. claims that "Morris S. Weeden is the person identified by Morton who negotiated the sale of the Friction Division contract. . . . Mr. Weeden's deposition would be the

logical starting point regarding Morton's potential arranger liability." (Id. at 13.) This is mere speculation that some fact somewhere exists that may demonstrate some intent to arrange for disposal; speculation, however, will not satisfy D.S.C.'s burden to demonstrate a genuine dispute of facts. See Fed.R.Civ.P. 56(a).

Morton responds that, while "[t]he analysis of arranger liability may, in certain cases, be fact-intensive, . . . D.S.C. has offered no facts in support of its argument that Morton may be liable as an arranger." (Morton Reply Br. at 10.) Morton notes that D.S.C.'s arranger argument (1) assumes that asbestos was left in the baghouses at the time of sale without facts to support the inference; (2) fails to demonstrate that the transaction documents display an intent to dispose of waste; and (3) places faulty reliance on any knowledge Morton may have had that Friction would necessarily utilize the baghouses to capture asbestos dust during its operations because the transaction was focused on the sale of an ongoing business comprised of useful, unused assets. (See id. (citing Burlington, 556 U.S. at 612 ("knowledge alone is insufficient to prove that an entity 'planned for' the disposal, particularly where the disposal occurs as a peripheral result of the legitimate sale of an unused, useful product")).).

The parties recognize that the transaction documents do not address the issue of wastes. (See Morton Br. at 24; see also 9-19-

12 Hearing Tr. at 32 ("THE COURT: The wastes are not addressed at all. MS. HENIG-ELONA: At all.").)  Where a contract selling a business does not mention wastes, the intent to dispose of wastes already on the property cannot be implied as a matter of law.  See Jersey City Redev. Auth. v. PPG Indus., 655 F.Supp. 1257, 1260 (D.N.J. 1987) ("Plaintiff conceded at argument that the [] contract does not refer to disposal of waste.  Plaintiff maintains, however, that the contract implicitly transfers [the seller's] obligation to dispose of the waste to [the buyer]. . . . [The seller], by conveying the entire property to [the buyer] in 1964 while foreseeing that [disposal may occur] by the future owner, did not 'arrange for' the disposal"), aff'd, Nos. 88-5184, 88-5185, 88-5220, 1988 U.S. App. LEXIS 18998 (3d Cir. Oct. 17, 1988), superseded by amendment to statute, N.J.S.A. § 58:10-23.11g.c(1), as recognized in Rockaway v. Klockner & Klockner, 811 F.Supp. 1039, 1051 (D.N.J. 1993) (superseded on other grounds, only with respect to the New Jersey Spill Compensation and Control Act).  Even if the transaction transfers some wastes existing on the subject site at that time, if the contract fails to specifically and intentionally concern the waste, the transaction will not "constitute an 'arrangement' to dispose of the waste".  Id.  Accordingly, the intent to arrange for the disposal of the hazardous substances, if

any, must arise from surrounding circumstances.  See Burlington,
556 U.S. at 611-12.

    Morton argues that there are no facts, direct or
circumstantial, indicating intent to dispose of wastes; rather, the
transaction aimed to transfer a going concern, and did not
constitute an agreement specifically for the disposal of wastes.
(See Morton Br. at 24; see also Morton Reply Br. at 9-11 ("The sale
included all of Morton's manufacturing equipment, including the
baghouses, as well as finished goods, works-in-progress, raw
materials, supplies, existing contracts, patents, and other assets
necessary for Friction to take over and continue to operate the
business. . . .  Morton, moreover, sold these assets for
substantial value, receiving a purchase price of $2,201,000.");
9-19-12 Tr. at 63 ("The sale of an ongoing business, and a useful
product, a useful piece of equipment in a business does not rise to
that level of [specific intent to cause the disposal of a hazardous
substance] required under the law to hold Morton liable as an
arranger under CERCLA.  They sold the business with the assumption
that this -- that the baghouses . . . would be disposed of properly
on a regular basis.  They couldn't have sold with any knowledge
that Friction later, 20 years later, may abandon the baghouses and
leave it in a state of disrepair, disarray, and cause a release at
that later time upon, again, the -- its abandonment.").)

There is no genuine dispute as to the facts in the record regarding the intent to dispose of hazardous substances through a sham transaction.  D.S.C.'s eleventh-hour indication that a deposition of Morris S. Weeden "would be the logical starting point regarding Morton's potential arranger liability" is insufficient to create a genuine dispute of fact.  "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  <u>Boykins v. Lucent Techs., Inc.</u>, 78 F.Supp.2d 402, 408 (E.D. Pa. 2000) (citation omitted), <u>aff'd</u>, 29 Fed.Appx. 100 (3d Cir. 2002).  Morton has demonstrated that the record reveals no facts indicative of an intent to arrange for the disposal of hazardous substances, and D.S.C. can point to no "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," to reveal a genuine issue of material fact. Fed.R.Civ.P. 56(c).

Thus, as the movant, Morton is entitled to judgment on the CERCLA claims as a matter of law.

## II.  State Law Claims for Contribution and Indemnification

Morton argues that D.S.C.'s common law claims for contribution and indemnification are preempted by CERCLA.  (<u>See</u> Morton Br. at 29-30.)  D.S.C. does not address this argument in its opposition

papers, nor did D.S.C. address preemption during oral argument.

(See generally D.S.C. Opp'n Br. at 1-16; see also 9-19-12 Tr. at 5-6.)  The Court has examined the cases cited by Morton in support of its argument for preemption and agrees that state common law claims for contribution and indemnification are preempted by CERCLA.

State common law contribution and indemnification claims are preempted by CERCLA due to the state laws' actual conflict with the federal statute:

> Unlike other areas where we have declined to find an actual conflict between CERCLA and state regulation, see Witco Corp. v. Beekhuis, 38 F.3d 682, 688-90 (3d Cir. 1994) (finding no conflict between CERCLA statute of limitations for contribution and Delaware state law limiting time period for claims against decedent's estate); Manor Care, Inc. v. Yaskin, 950 F.2d 122, 127 (3d Cir. 1991) (finding no conflict between CERCLA and cost recovery provisions of New Jersey Spill Compensation and Control Act), we do find a conflict here between Conrail's common law claims for contribution and restitution and the remedies expressly provided in the statute.  The conflict arises because the state law remedies obstruct the intent of Congress. Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 281 (1987). . . .  [W]hen Congress expressly created a statutory right of contribution in CERCLA § 113(f), 42 U.S.C. § 9613(f), it made that remedy a part of an elaborate settlement scheme aimed at the efficient resolution of environmental disputes.  Permitting independent common law remedies would create a path around the statutory settlement scheme, raising an obstacle to the intent of Congress.  We conclude therefore that Conrail's common law claims are preempted by CERCLA § 113(f).

In re Reading Co., 115 F.3d 1111, 1117 (3d Cir. 1997) (regarding state common law claims for contribution and indemnification),

abrogated on other grounds by <u>Atl. Research</u>, 551 U.S. 128; <u>see</u> <u>A.E.</u>
<u>Staley Mfg.</u>, 343 F.3d at 685 ("the District Court's grant of
judgment to Tenneco on the common law contribution claim was
appropriate because that claim is preempted by CERCLA Section
113(f)") (citing <u>In re Reading Co.</u>, 115 F.3d at 1117); <u>Litgo</u>, 2010
WL 2400388, at *36 (stating defendants "have asserted common law
contribution and indemnification counterclaims against Plaintiffs
and the other defendants.  These must be dismissed, as any claim
for contribution or indemnification under common law is preempted
by CERCLA.").

Accordingly, the Court will grant summary judgment in favor of
Morton on all state common law claims for contribution and
indemnification.

**CONCLUSION**

For the reasons stated <u>supra</u>, the Court will grant Morton's
motion for summary judgment.  The Court will issue an appropriate
Order and Judgment.

s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated: June 12, 2013